UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT PIKEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>V.<br><br>WENDELL KEITH HALL,<br>    Defendant. | CRIMINAL ACTION NO. 7:14-cr-20-KKC<br><br><br>**OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

On June 26, 2015, the jury found Defendant Wendell Keith Hall guilty of violating 18 U.S.C. § 666(a)(2). This matter is now before the court on Hall's post-verdict motion for a new trial pursuant to Federal Rule of Criminal Procedure 33(a). Hall's motion asserts that a singular comment exclaimed by his estranged wife during her direct examination rendered his trial so prejudicial that it violated his right to a fair trial. (DE 81 Mot. for New Trial at 4–6.) His motion, however, does not evaluate all of the factual evidence presented at trial, the timing of the statement, the lack of emphasis on the statement, or the Court's actions immediately after the statement. Accordingly, all of the facts and events at trial are worthy of examination, and, for the following reasons, the Court will deny Hall's motion.

## I. FACTUAL BACKGROUND

In late 2012, the Kentucky Office of the Inspector General ("OIG") initiated an investigation based on allegations that Kelly Shortridge attempted to extort money from Wendell Keith Hall. Shortridge worked as a mine inspector for the Kentucky Division of Mine Reclamation and Enforcement ("DMRE"). Hall owned a number of small, family-run businesses, including Beech Creek Coal Company ("BCCC"), and served as a member of the

Kentucky House of Representatives. BCCC held several permits for surface coal mining in Eastern Kentucky.

During the investigation, the OIG attempted to meet with Hall to verify Shortridge's alleged actions; however, Hall refused to speak with the OIG. The OIG—without the power to issue subpoenas—could not compel Hall to cooperate and could not access any of Shortridge's or Hall's financial information. Therefore, the OIG was unable to confirm whether Shortridge had attempted to extort Hall or if Shortridge, a mine inspector, and Hall, a mine operator, had an inappropriate financial relationship.

After the OIG published a report on its investigation, the United States Department of the Interior, Office of Surface Mining ("OSM") contacted the Federal Bureau of Investigation ("FBI") and requested the FBI commence a separate investigation. The FBI issued subpoenas for witnesses, financial information, DMRE inspection records, and other pertinent documents. After the FBI concluded its investigation, the government presented an indictment to the federal grand jury. The grand jury returned a true bill. The indictment alleged that Hall paid Shortridge over $46,000 to influence Shortridge's actions as a mine inspector in violation of 18 U.S.C. § 666(a). On March 18, 2015, Shortridge pleaded guilty to violating 18 U.S.C. § 666(a)(1)(B), solicitation of a bribe by an agent of a program receiving federal funds. Hall proceeded to trial.

At Hall's week-long trial, the government presented seventeen witnesses and over one hundred documents to support the theory that Hall paid Shortridge not to cite violations of surface mining reclamation laws at BCCC's mines. Hall did not contest that he had paid over $46,000 to Shortridge, but he denied that he made these payments in contemplation of Shortridge's duties as an inspector of BCCC's mines.

At the beginning of its presentation of evidence, the government called several of Shortridge's co-workers and supervisors at the DMRE to testify. These witnesses detailed Shortridge's "cozy" relationship with Hall, including Shortridge's attempted exploitation of his friendship with Hall to insulate himself from intra-department discipline, and Shortridge's interest in maintaining his status as the DMRE inspector assigned to BCCC's mines. Certain DMRE witnesses also explained how Shortridge failed to issue citations for obvious violations of surface mining reclamation laws. For example, he did not cite a BCCC surface mine for failing to construct *any* sediment ponds. Surface mines require sediment ponds and it is obvious to everyone—especially government agents tasked with enforcing surface mining reclamation laws—whether a mine site *has* a sediment pond. A sediment pond, however, can be expensive to construct. DMRE employee Charles Holbrook explained that an active surface mine without a sediment pond must cease all operations until the pond is built, that mine operators must use explosives and drills to build a sediment pond, and that the DMRE assesses fines for failing to timely construct a sediment pond. Overall, these witnesses explained that Hall's mines did not receive all required citations while Shortridge was tasked with inspecting BCCC's mines and that Shortridge flaunted his friendship with Hall. The DMRE witnesses described how both Shortridge's and Hall's actions were abnormal and inappropriate for a mine inspector and a mine operator.

The government then called the OIG investigator to clarify the extent of his investigation and why he was unable to determine that Shortridge and Hall had an inappropriate financial relationship. The OIG investigator explained that he could not access financial records or compel witnesses, notably Hall, to speak with him. Next, the FBI forensic accountant detailed the differences between the OIG's and the FBI's investigations. The forensic accountant described the additional information the FBI gathered after issuing

3

subpoenas and how that additional information—coupled with DMRE inspection records—demonstrated Hall and Shortridge's inappropriate financial relationship.

The government proceeded with its presentation of evidence by calling Shortridge as a witness. Shortridge described the origin of his financial relationship with Hall. He explained that, in 2009, he revealed to Hall that his wife suffered an injury and that he struggled to make timely loan payments for his automobile. Hall told Shortridge that he could help refinance this automobile loan and instructed Shortridge to go to the Community Trust Bank branch in Phelps, Kentucky ("Phelps CTB"). When Shortridge arrived at the Phelps CTB, the branch manager presented Shortridge with ready-to-sign automobile loan documents that listed Hall and Shortridge as co-signers. Shortridge signed the documents. In the next few months, Hall made two payments on the loan and Shortridge received other unsolicited financial contributions from Hall's employees. Shortridge expressed his gratitude for Hall's help but emphasized that Hall initiated these transactions.

Additionally, Shortridge described meeting with Hall at his office. After one closed-door meeting, Hall's secretary helped Shortridge establish a Kentucky limited liability company, DKJ Consulting. DKJ Consulting received nearly all of its funding from five different checks issued in 2010 totally $43,000. Shortridge explained that all five checks came from businesses associated with Hall and that he understood that these checks came "with strings attached." Specifically, Shortridge admitted that, after he received more than $40,000 from Hall, he gave operators mining BCCC sites extra time to fix violations of surface mining reclamation laws—often resulting in the BCCC site avoiding citations and fines—and he didn't issue a citation for coal augering on a BCCC site that occurred outside the permitted area for augering.

Further, he presented a picture of himself and Hall in the chamber of the Kentucky House of Representatives inscribed with a handwritten note from Hall stating "to Kelly, future Director of OSML." OSML is another acronym associated with the DMRE, and Shortridge interpreted this note as an expectation that he owed Hall favors throughout his career at the DMRE.

Finally, Shortridge explained why he pleaded guilty to soliciting a bribe in violation of 18 U.S.C. § 666(a)(1)(B). He admitted that DKJ Consulting was not a consulting firm and that he had not performed services worth $43,000. He confessed that Hall's payments influenced him, as the DMRE inspector of BCCC's mines, to not cite BCCC for violations of surface mining reclamation laws.

The government then called four individuals that worked in Hall's small, family-run office as witnesses. These witnesses generally verified Shortridge's explanation of his relationship with Hall. The four witnesses explained various aspects of Hall's business dealings and corroborated previous testimony. One witness, Stephanie Hall, also testified about her duties as Hall's former business partner. At the beginning of Stephanie's testimony, the government explicitly asked Stephanie whether she was Hall's estranged wife. Stephanie answered affirmatively. Later, while she explained her duties as Hall's business partner, she stated that the company used "consulting" as a code for "under-the-table kickbacks." Hall immediately objected and moved for a mistrial. The Court denied Hall's motion and instructed the jury not to consider Stephanie's statement for *any* purpose. Stephanie's direct- and cross-examination continued without incident.

Finally, the government called an OSM investigator to testify. The OSM investigator described a "case timeline" that she created in preparation for trial. The case timeline established the chronology of when payments were made to whom, when Shortridge's

5

inspections of BCCC's mines occurred, and what—if any—citations Shortridge issued. The OSM investigator explained why, in her opinion, the timeline demonstrated that Hall's payments influenced Shortridge's actions.

After the government completed its presentation of evidence, Hall moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(a), asserting that the government did not present sufficient evidence to establish the elements of the charged offense. Specifically, Hall argued that the government failed to demonstrate that he corruptly gave money to influence Shortridge in connection with Shortridge's duties as a DMRE mine inspector or that the "business, transaction, or series of transactions . . . involv[ed] anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2). The Court found that the government had introduced sufficient evidence to sustain a conviction. Fed. R. Crim. P. 29(a).

Hall then testified in his own defense. He described his relationship with Shortridge. He acknowledged paying Shortridge more than $46,000; however, Hall asserted that he made these payments in contemplation of Shortridge's consulting services and as a "finder's fee." Hall also attempted to refute the evidence establishing that he intended to influence Shortridge.

First, Hall acknowledged his "cozy" relationship with Shortridge. He claimed that Shortridge was a "good political friend" and popular in his Kentucky House of Representatives district. Hall stated that his friendship with Shortridge helped him to win elections. He also admitted that Shortridge carbon copied him on internal DMRE emails concerning the DMRE's discipline of Shortridge for alleged poor performance, insubordination, and workplace violence but denied that he ever intervened or prevented the DMRE from taking internal disciplinary action. Hall acknowledged that some of

6

Shortridge's actions and requests were "odd," but Hall claimed that he could not lose his friendship with Shortridge.

Second, he asserted that he had no knowledge of Shortridge's failure to cite obvious violations of surface mining reclamation laws, including the failure to construct sediment ponds. Hall reiterated that BCCC only held the *permit* for surface mining and that other companies *operated* the mine site. Further, he introduced evidence of an indemnification agreement between BCCC and the operator stating that the operator would indemnify BCCC for any violations and citations that occurred on BCCC-permitted sites. During cross examination, however, Hall admitted that he received a significant financial benefit from the operator's actions on BCCC's mines.

Third, Hall explained his actions with the OIG. He provided two different, and inconsistent, reasons for his refusal to cooperate with the OIG investigation into Shortridge's attempted extortion. Hall initially stated that he did not cooperate with the OIG investigator because he had no additional information that could assist the investigation. Then, Hall asserted that he could have provided additional information to the OIG investigator but he feared further involvement in a complaint against a DMRE employee. He claimed that if a mine operator levied allegations against a DMRE employee, then the DMRE would "come and get you."

Fourth, he admitted that he facilitated the terms and preparation of the documents for the loan he co-signed with Shortridge. Hall explained that he knew the branch manager of the Phelps CTB and that he asked the branch manager how he could help refinance Shortridge's automobile loan. The branch manager told Hall that Shortridge had bad credit and that Hall would have to co-sign the loan. Hall agreed. The branch manager then prepared the documents for Hall and Shortridge. Hall noted, as a co-signer, he was liable

whenever Shortridge failed to make payments and stated that he only made loan payments after receiving "past due enforcer" notices. During cross examination, Hall admitted that co-signing a loan with Shortridge was "awkward," but Hall justified his actions because he co-signed on loans for friends and reiterated that Shortridge was an important political friend.

Fifth, Hall conceded that he asked an employee, Jerry Hurley, if Jerry could "help out" Shortridge. Hall claimed that he did not order Jerry to provide financial support to Shortridge; Hall said that he merely informed Jerry that Shortridge was "in trouble." Hall then asserted that he never had another conversation with Jerry about Shortridge's financial trouble. He stated that he was not concerned whether Jerry had, in fact, given money or Shortridge, and he claimed that Jerry did not expect repayment from Shortridge or Hall. But during cross examination, the government questioned Hall about payroll checks that he issued to Jerry's wife, Shelia. The government noted that Shelia received regular paychecks from Hall as a secretary in Hall's office but that, on one occasion *eight days* after Jerry made a loan payment on Shortridge's behalf, the amount of Shelia's paycheck increased by over $1,100. Hall could not explain this substantial, one-time increase in Shelia's compensation.

Sixth, he denied knowledge about DKJ Consulting's formation. Hall acknowledged that he met privately with Shortridge but presumed that his secretary helped Shortridge establish this limited liability company because Shortridge was "friends with all the girls" in his office. Hall also explained that his companies wrote checks to DKJ Consulting because Shortridge provided consulting services to Hall. Specifically, Hall claims that Shortridge introduced him to an individual who helped negotiate the sale of the mining rights for a property owned and permitted by BCCC. But when asked during cross

examination why Hall wrote checks to DKJ Consulting rather than Kelly Shortridge, Hall stated that he wanted a "legitimate" business transaction with a company.

Seventh, Hall also denied that he auguered coal "off permit." He stated that he is not involved in the day-to-day mining operations and insinuated that Mackey Norman, Hall's on-site employee, made a separate deal with Shortridge for Norman to auger coal outside the BCCC permit area.

Finally, he explained the picture that he gave to Shortridge. Hall noted that he frequently took pictures with constituents in the chambers of the Kentucky House of Representatives. He stated that he always wrote inscriptions on pictures so that the constituent had a personalized memento from his or her visit, and Hall claimed that the inscription that Shortridge would become the director of the agency overseeing BCCC's permits was "a joke."

Hall called two additional witnesses to attempt to verify certain facts pertinent to the narrative Hall told the jury. The government then called two rebuttal witnesses, including Mackey Norman. Norman denied making a separate deal with Shortridge to auger coal "off permit" and testified that he always acted at Hall's direction. Norman stated that the deal to auger coal "off permit" was between Hall and Shortridge.

Both parties completed their presentation of the evidence and made closing statements. The Court then instructed the jury on the law and dismissed the jury to deliberate. The jury deliberated for approximately an hour before returning a guilty verdict.

## II. STANDARD OF REVIEW

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Rule does not define the "interest of justice" standard; however, the Sixth Circuit

applies this standard only "where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010); *see also United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001) (noting that "new trial motions are disfavored and should be granted with caution"). Substantial legal error includes violations of a defendant's Constitutional rights or clear reversible error. *See id.* at 373–74. The defendant bears the burden of proving substantial legal error. *Id.*

### III. ANALYSIS

Hall asserts that he is entitled to a new trial because Stephanie Hall's statement that, in the course of BCCC's business, the term "consulting" meant "under-the-table kickbacks" was inadmissible and tainted the jury. (DE 81 Mot. for New Trial at 4–6.) Hall asserts that this statement was "outrageous and vindictive . . . which she knew struck at the very heart of [Hall's] credibility and defense," and, therefore, Stephanie's statement deprived him of his right to a fair trial. (DE 81 Mot. for New Trial at 4–6.)

The government contends that this statement does not meet the "substantial legal error" standard necessary for a new trial under Rule 33 because Stephanie's statement *was* admissible or—alternatively—that, in the context of the entire trial, the trial was not rendered unfair by the utterance of the statement. (DE 82 Resp. in Opp'n at 1–4.)

#### A. ADMISSIBILITY OF STEPHANIE'S STATEMENT

Generally, "[r]elevant evidence is admissible." Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence, however, may be excluded.

Here, Stephanie's statement was relevant. Stephanie, the defendant's former *business partner*, made the statement in response to a question concerning BCCC's typical

10

business practices. The statement bears directly on the following question of fact: Did Hall pay Shortridge for legitimate consulting services or in contemplation of Shortridge's duties as a mine inspector? Stephanie's statement makes it more likely that Hall made payments in contemplation of Shortridge's duties as a mine inspector, and that fact is of consequence in determining whether Hall violated 18 U.S.C. § 666(a)(2). *See* Fed. R. Evid. 401.

But this relevant statement is inadmissible. Federal Rule of Evidence 404(b) enables the government to, in certain circumstances, introduce evidence of "crimes, wrong, or other acts" committed by the defendant; however, "[i]n deciding the admissibility of Rule 404(b) evidence, the district court [must] employ[ ] a three-step process in which it [determines] whether: (1) the 'other act' actually occurred, (2) the evidence is offered for a permissible purpose, and (3) its probative value is not substantially outweighed by unfair prejudice." *United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015). Here, the government never introduced any evidence, at or before trial, that the 'other act' actually occurred. Stephanie did not substantiate her claim that "consulting" meant "under-the-table kickbacks;" the government did not introduce any other testimonial or documentary evidence that BCCC had used the term "consulting" for an "under-the-table kickback" in any prior business dealing; and the Court did not make a finding that the "other act" occurred. Therefore, Stephanie's statement does *not* satisfy the three-step process for admissibility of Rule 404(b) evidence. *Carter*, 779 F.3d at 625.

## B. INTEREST OF JUSTICE STANDARD

Although Stephanie's statement was inadmissible as evidence, Hall is not entitled to a new trial unless the statement created a "substantial legal error." *Munoz*, 605 F.3d at 373. A defendant may establish substantial legal error if he can demonstrate that a reversible error occurred during his trial. *Id*. It is axiomatic that the introduction, and even

11

*admission*, of inadmissible evidence does not always constitute reversible error because the trial court can "cure" the defect through instructions and admonitions to the jury. *Bruton v. United States*, 391 U.S. 123, 135 (1968) ("Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently."). "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953).

The introduction of inadmissible evidence only requires a new trial if an instruction or admonition cannot cure the error. *See United States v. Frederick*, 406 F.3d 754, 762 (6th Cir. 2005) (determining that a judge's comments that distort or add to evidence may be incurable); *see also Bruton*, 391 U.S. at 135–36 (finding that limiting instructions could not cure "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant"); *Burgett v. Texas*, 389 U.S. 109, 115 (1967) (holding that instructions could not cure the introduction of presumptively void prior criminal convictions used to enhance punishment); *United States v. Nelson*, 725 F.3d 615, 622 (6th Cir. 2013) (concluding that instructions and admonitions could not eliminate the prejudice created after the government introduced *multiple* inadmissible statements concerning a suspect's description when the perpetrator's identity was a key issue for the jury's resolution); *United States v. Costin*, 59 F. App'x 726, 730 (6th Cir. 2003) (holding that the trial court did not err in determining that the efficacy of its limiting instructions was compromised because the court had to issue nearly 100 limiting instructions to the jury). But the Court "normally presume[s] that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions *and* a strong

12

likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (emphasis added) (citations omitted); *see also Richardson v. Marsh*, 481 U.S. 200, 206–07 (1987) (noting that there is an "almost invariable assumption of the law that jurors follow their instructions" and that courts frequently instruct juries that particular pieces of evidence may be considered for specific purposes).

Here, Stephanie's statement did not create an incurable error. This singular comment inadvertently uttered—and immediately admonished by the Court—during the early afternoon of the third day of a five-day trial by a witness that the jury knew was adverse to the defendant and was given among overwhelming testimonial and documentary evidence did not constitute substantial error. *See Munoz*, 605 F.3d at 373. First, Stephanie introduced a single, fleeting comment. *Compare Nelson*, 725 F.3d at 622 (finding repeated inadmissible comments from multiple witnesses concerning a similar fact of consequence established incurable error), *and United States v. Solivan*, 937 F.2d 1146, 1157 (6th Cir. 1991) (concluding that a single, grossly prejudicial, and emphasized comment from a *prosecutor* during closing argument may be incurable), *with United States v. Fredell*, 79 F. App'x 799, 809–10 (6th Cir. 2003) (holding that an immediate instruction to disregard the introduction of evidence that violated Rule 404(b) cured any error or prejudice to the defendant (citing *United States v. Steele*, 727 F.2d 580, 588 (6th Cir. 1984))); *United States v. Flores*, 73 F.3d 826, 832 (8th Cir. 1996) (finding that an instruction cured a single, fleeting statement from a *witness* given in the middle of a lengthy trial even though the statement violated Rule 404(b)). Second, the Court immediately admonished the jury to disregard Stephanie's statement and instructed the jury not to consider it for any purpose. *Fredell*, 79 F. App'x at 809–10. Third, Stephanie's fleeting comment occurred during the

middle of a lengthy trial and the government did not emphasize or repeat her statement. *See Flores*, 73 F.3d at 832. Fourth, the inadmissible statement came from a witness known to be adverse to the defendant and not from an officer or a prosecutor. *Compare United States v. Eaton*, 784 F.3d 298, 309–10 (6th Cir. 2015) (analyzing the requirements for establishing whether prosecutorial statements allegedly constituting misconduct were improper and warranted a new trial), *with Fredell*, 79 F. App'x at 809–10 (holding that a witness's statement made in violation of Rule 404(b) may be cured through an instruction).

Finally, the evidence against Hall was strong. *See Eaton*, 784 F.3d at 309 (noting that even improper prosecutorial statements may not warrant a new trial if the evidence against the defendant was strong). Seventeen witnesses for the government painted a uniform picture, corroborated through the introduction of over one hundred documents, of Hall's intent to influence Shortridge in Shortridge's capacity as a DMRE inspector of BCCC's mines. Further, Hall's testimony did not offer credible explanations to discredit the government's mountain of evidence. Hall's testimony was also directly contradicted through Norman's testimony during rebuttal. Overall, Stephanie's statement, and likely her entire testimony, did not have any influence on the jury's swift decision to find Hall guilty.

Therefore, Stephanie's statement did not establish "substantial legal error." *Munoz*, 605 F.3d at 373; *see also Greer*, 483 U.S. at 766 n.8 (noting that a trial court's instruction and admonition is presumptively curative unless there is an 'overwhelming probability' that the jury could not adhere to the trial court's instruction *and* that the inadvertent evidence 'devastated' the defendant's case). The trial context clarifies that the Court could easily cure Stephanie's comment; there was no 'overwhelming probability' that the jury could not adhere to the Court's immediate admonition and instruction; and Stephanie's statement did not devastate Hall's case. *See Greer*, 483 U.S. at 766 n.8.

## IV. CONCLUSION

For reasons stated above, the Court hereby **ORDERS** that Defendant Wendell Keith Hall's motion for new trial (DE 81) is **DENIED**.

Dated August 26, 2015.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY